FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 27 2022

KEVIN P. WEIMER, Clerk
BY: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* AMELIA CHAVOUS, KALYNNE DUNLAY, and GARY MOORE, JR., <br><br> Plaintiffs, <br><br> v. <br><br> HEALTH WEALTH SAFE, INC.; DR. SUBODH AGRAWAL; MEDICAL OFFICE FORCE, LLC; ATHENS HEART CENTER, P.C.; ATHENS MEDICAL ASSOCIATES, P.C.; BALIGA FAMILY PRACTICE, P.C.; C.V. CLOPTON, JR MD, P.C.; DARRELL L. MURRAY MD PC; EAGLE'S LANDING DIABETES & ENDOCRINOLOGY, P.C.; EAST ALABAMA ENDOCRINOLOGY, P.C.; HEART OF GEORGIA PRIMARY CARE, LLC; LIFELINE PRIMARY CARE, INC.; LOCUST GROVE FAMILY MEDICINE, PC; PROFESSIONAL ASSOCIATES OF JACKSON LLC; and STONE MOUNTAIN FAMILY PRACTICE, P.C., <br><br> Defendants. | Civil Action No. **1:22-CV-2553** <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

1

Plaintiffs Amelia Chavous, Kalynne Dunlay, and Gary Moore, Jr. (collectively "Relators") bring this *qui tam* action against Defendants on behalf of the United States of America and the State of Georgia against Defendants to recover all damages, penalties, and other remedies under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.* ("Georgia FMCA").

## INTRODUCTION

1.     This case involves a fraudulent scheme related to Remote Physiologic Monitoring ("RPM" which is also referred to as "Remote Patient Monitoring") and Chronic Care Management ("CCM") services reimbursed by government programs. At one point during the scheme, Defendants failed to even provide the patients with the devices needed to perform these services.

2.     Defendants have knowingly engineered, participated in, and conspired to perpetrate a scheme to defraud federal healthcare programs, including Medicare and Medicaid. The fraudulent scheme began in 2018, when Defendant Health Wealth Safe, Inc. and Defendant Dr. Subodh Agrawal started offering kickbacks to physician practice groups in exchange for the Physician Practice Defendants enrolling their patients in Health Wealth Safe, Inc.'s RPM and CCM services program using the myRemoteCheckup application and profiting off of the scheme.

2

3. While close to 40-50% of the physician groups that Health Wealth Safe and Medical Office Force recruited into their scheme were located in Georgia, other practices were located across the country, including in Alabama, Texas, Tennessee, Hawaii, and South Carolina. The primary physician practice groups that referred their patients to Health Wealth Safe in exchange for illegal kickbacks were: Athens Heart Center, P.C.; Athens Medical Associates, P.C.; Baliga Family Practice, P.C.; C.V. Clopton, Jr MD, P.C.; Darrell L. Murray MD PC; Eagle's Landing Diabetes & Endocrinology, P.C.; East Alabama Endocrinology, P.C.; Heart of Georgia Primary Care, LLC; Lifeline Primary Care, Inc.; Locust Grove Family Medicine, PC; Professional Associates of Jackson LLC; and Stone Mountain Family Practice, P.C. (collectively referred to as the "Physician Practice Defendants").

4. Under the terms of Defendants' Standard Services Agreements, the Physician Practice Defendants were required to: (1) grant Health Wealth Safe access to their EMR systems, allowing Health Wealth Safe to solicit the practices' unknowing Medicare and Medicaid patients for the scheme; (2) assist in the recruitment of their patients; and (3) sign over their right to bill for the RPM and CCM services to Medical Office Force. Health Wealth Safe would purportedly provide the RPM and CCM services through its myRemoteCheckup application, and Medical Office Force would bill these services under the Defendant Physician

Practices' NPIs to insurers, including Medicare and Medicaid, and would obtain the reimbursement.

5.     In exchange for participating in the scheme, the Defendant Physician Practices would receive all of the reimbursements for the RPM and CCM services provided by Health Wealth Safe with the exception of a $60-per-patient-per-month charge that Health Wealth Safe kept for themselves.  Simply put, in exchange for enrolling their patients in Health Wealth Safe's RPM and CCM services, the Defendant Physician Practices would receive kickbacks in the form of the reimbursements obtained for services they did not perform.  The claims resulting from this fraudulent scheme were tainted by these Anti-Kickback Statute violations.

6.     From early 2019 until April 2021, and despite repeated concerns raised by Relators, other employees, and physicians who refused to participate in the scheme, Health Wealth Safe did not even distribute devices to collect the data as required by CMS when performing RPM services.

7.     Instead, Health Wealth Safe's "navigators"—who had no clinical training, licensure, or expertise—simply monitored the self-reported information patients entered into the myRemoteCheckup application.   Some patients did not even have the myRemoteCheckup application.  For those patients, navigators called them and asked them the questions found in the app.  These practices, neither of

4

which meet CMS's requirements for the reimbursement of RPM services, continued for at least 2 1/2 years.

8.    Even when Health Wealth Safe started actually distributing devices, it violated other Medicare regulations, such as not recording data for the required 16 days per month, not properly obtaining the patients' consent, not ensuring proper supervision by the billing physician, and billing improper CPT codes.

9.    Furthermore, the results of the RPM services were rarely used by the Physician Practice Defendants in the diagnosis and treatment of the patients.

10.    Similarly, when providing the CCM services, Defendants failed to develop a care plan (as required by CMS) or provide the other required intensive services.

11.    In other words, the government receives a bill for the CCM or RPM services, the Physician Practice Defendants obtain taxpayer dollars (the reimbursements less the $60-per-patient-per-month payment kept by Health Wealth Safe), and the patients receive no health benefits.

12.    As detailed below, in 2020, the Centers for Medicare and Medicaid Services ("CMS") instituted a telemedicine-friendly environment to assist patients during the Public Health Emergency ("PHE") caused by the COVID-19 Pandemic.

Defendants exploited this telemedicine environment to perpetrate an abusive and fraudulent scheme for their own personal gain.

13.    Defendants also violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") through their improper handling of the patients' protected health information.

14.    Finally, Defendant Medical Office Force improperly secured a $134,486 Paycheck Protection Program loan on April 12, 2020, that the government forgave on December 8, 2020, after Defendants falsified Medical Office Force's number of employees and the amount spent on payroll.

15.    As further detailed herein, Defendants have knowingly engaged in misconduct resulting in the submission of false claims for thousands of patients to America's healthcare programs.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

16.    Defendants are vicariously liable for the actions and omissions of their executives, employees, and agents.

## JURISDICTION AND VENUE

17.    This action arises under the federal False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.*

18.     Jurisdiction over this action is conferred upon this Court by 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

19.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a).  Jurisdiction is proper over Defendants because some or all of them have transacted business within this Court's jurisdiction, and some of the alleged violations under 31 U.S.C. § 3729 occurred within the Northern District of Georgia.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because one or more Defendants transact business within this District and some of the acts complained of occurred within the Northern District of Georgia.

21.     Supplemental jurisdiction for counts related to the Georgia False Medicaid Claims Act arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  In addition, 31 U.S.C. § 3732(b) provides jurisdiction for "any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730."  The state claims at issue here arise out of the same transaction or occurrence as the federal claims.

22.     Relators have direct and independent knowledge of the information on which the allegations are based and have voluntarily disclosed the allegations of this Complaint to the United States of America and the State of Georgia prior to filing, as required by the relevant statutes.   The allegations set forth in this Complaint are not based on any public disclosure of allegations or transactions as defined in 31 U.S.C. §3730(e)(4)(A).   Furthermore, if there has been a public disclosure of any of the allegations underlying this action, Relators qualify as original sources of such information pursuant to 31 U.S.C. §3730(e)(4)(B) and O.C.G.A. §49-4-168.2(l).

23.     Relators have complied with all conditions precedent to bringing this action.

## PARTIES

24.     Plaintiff Relator Amelia Chavous is an individual and citizen of the United States of America and the State of Georgia, currently residing in Winder, Georgia.  Relator Chavous obtained her Master's in Healthcare Administration from the University of Arizona in 2019.   In December 2019, she started working for Defendant Health Wealth Safe, Inc.  Relator Chavous started as a Medical Assistant and Patient Care Coordinator and was promoted to the Director of Care Managers after four months.   She supervised approximately 60 employees, trained team

leaders, and was responsible for developing processes and procedures for the employees who interacted with the patients receiving RPM and CCM services. Relator Chavous left Health Wealth Safe, Inc. in October 2021.

25.     Plaintiff Relator Kalynne Dunlay is an individual and citizen of the United States of America and the State of Texas, currently residing in Fort Worth, Texas. Relator Dunlay received an Offer of Employment signed by Health Wealth Safe, Inc.'s Chief Operating Officer, Mark Anthony, on July 22, 2020. Relator Dunlay started working at Defendant Health Wealth Safe, Inc. in September 2020. Although her Employment Letter said she was being hired the position of Navigator, she worked on the Sales Team pitching physician practices to contract with Health Wealth Safe to provide RPM and CCM services. Relator Dunlay's work at Health Wealth Safe ended on December 4, 2020.

26.     Plaintiff Relator Gary Moore, Jr. is an individual and citizen of the United States of America and the State of Georgia, currently residing in Stockbridge, Georgia. Relator Moore began working with Defendant Health Wealth Safe, Inc. in March 2020, as a sales associate. A couple months after starting, he began working with the leadership team. He left Health Wealth Safe, Inc. in April 2021.

27.     Relators' direct and firsthand knowledge of the fraudulent activity discussed herein began in 2019, when Relator Chavous started working at Health

9

Wealth Safe, Inc. To Relators' knowledge and belief, Defendants' fraudulent conduct continues today.

28. Defendant Health Wealth Safe, Inc. (NPI 1952860496) is a Delaware for-profit corporation with its principal office located at 1307 Cleveland Road, Bogart, Georgia 30622. According to Health Wealth Safe, Inc.'s website and communications, its address is 2005 Prince Avenue, Athens, Georgia, 30606. Health Wealth Safe, Inc. transacts business in the Northern District of Georgia and the State of Georgia by offering and facilitating Remote Physiological Monitoring Services and Chronic Care Management Services that are reimbursed by federal healthcare programs. Health Wealth Safe, Inc. was formed in Delaware on July 17, 2018, and became active in Georgia on August 22, 2018. Health Wealth Safe, Inc.'s current Chief Executive Officer and Chief Financial Officer is Dr. Subodh Agrawal. Its Secretary is Gur Agrawal, Dr. Agrawal's wife. Health Wealth Safe, Inc. can be served with process by its registered agent C T Corporation System located at 289 Culver Street, Lawrenceville, Georgia 30046.

29. Defendant Medical Office Force, LLC is a Georgia corporation with its principal office also located at 1307 Cleveland Road, Bogart, Georgia 30622. According to Medical Office Force LLC's website, its address is 2005 Prince Avenue, Athens, Georgia, 30606. Medical Office Force LLC transacts business in

10

the Northern District of Georgia and the State of Georgia by billing for Remote Physiological Monitoring Services and Chronic Care Management Services that are reimbursed by federal healthcare programs. Defendant Dr. Agrawal founded Medical Office Force LLC in Georgia on June 11, 2015. Medical Office Force LLC can be served with process by its registered agent Gur Pyari Agrawal located at 2005 Prince Avenue, Athens, Georgia 30606.

30. Defendant Dr. Subodh Agrawal (NPI 1366443640)(Georgia Physician License No. 28344) is a Board-certified cardiologist, internist, sleep medicine, and pain management physician. His practice address is 2005 Prince Avenue, Athens, Georgia 30606. Dr. Agrawal transacts business in the Northern District of Georgia and the State of Georgia by offering and facilitating Remote Physiological Monitoring Services and Chronic Care Management Services that are reimbursed by federal healthcare programs. Dr. Agrawal is the Chief Executive Officer and Chief Financial Officer of Defendant Health Wealth Safe, Inc. He also owns Family First Healthcare of Northeast Georgia and Athens Heart Center, P.C., where he practices medicine. Dr. Agrawal is enrolled in federal health care programs, such as the Medicare and Medicaid programs. Dr. Agrawal can be personally served with process at his practice located at 2005 Prince Avenue, Athens, Georgia 30606.

31.     Defendant Athens Heart Center, P.C. is a cardiology practice with a principal address of 2005 Prince Avenue, Athens, Georgia 30606. Its primary physician is Dr. Agrawal. Athens Heart Center, P.C. contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Athens Heart Center, P.C. can be served with process by its registered agent Dr. Agrawal located at 2005 Prince Avenue, Athens, Georgia 30606.

32.     Defendant Athens Medical Associates, P.C. is an internal medicine practice with a principal address of 130 Hawthorne Park, Athens, Georgia 30606. Its primary physician is Dr. Zaigham Butt (NPI 1588743728). Athens Medical Associates contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Athens Medical Associates, P.C. can be served with process by its registered agent Dr. Butt located at 1090 Settlers Ridge Road, Athens, Georgia 30606.

33.     Defendant Baliga Family Practice, P.C. is a family medicine practice with a principal address of 1400 Bradley Lake Boulevard, Columbus, Georgia

31904. Its primary physician is Dr. Bantwal Baliga (NPI 1730272584). Baliga Family Practice contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Baliga Family Practice can be served with process by its registered agent Dr. Bantwal Baliga located at 7831 Eagles Landing Court, Columbus, Georgia 31909.

34.     Defendant C.V. Clopton, Jr. MD, P.C. is a family medicine practice with a principal address of 2611 North Clark Drive, East Point, Georgia 30344. Its primary physician is Dr. Charles Clopton, Jr. (NPI 1770514440). C.V. Clopton, Jr. MD, P.C. transacts business in the Northern District of Georgia and the State of Georgia by contracting with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. C.V. Clopton, Jr. MD, P.C. can be served with process by its registered agent Dr. Clopton located at 2611 North Clark Drive, East Point, Georgia 30344.

35.     Defendant Darrell L. Murray MD PC is a family medicine practice with a principal address of 5750 Brook Hollow Parkway, Suite 203, Norcross, Georgia 30097. Its primary physician is Dr. Darrell Murray (NPI 1447250170). Darrell L.

Murray MD PC transacts business in the Northern District of Georgia and the State of Georgia by contracting with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Darrell L. Murray MD PC can be served with process by its registered agent Dr. Murray located at 5750 Brook Hollow Parkway, Suite 203, Norcross, Georgia 30097.

36. Defendant Eagle's Landing Diabetes & Endocrinology, P.C. is an endocrinology practice with a principal address of 550 Eagles Landing Parkway, Suite 110, Stockbridge, Georgia 30281. Its primary physician involved in the Remote Patient Monitoring and Chronic Care Management services is Dr. Ronald Watts (NPI 1942301759). Eagle's Landing Diabetes & Endocrinology transacts business in the Northern District of Georgia and the State of Georgia and contracted with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Eagle's Landing Diabetes & Endocrinology can be served with process by its registered agent Dr. Watts located at 550 Eagles Landing Parkway, Suite 110, Stockbridge, Georgia 30281.

37.     Defendant East Alabama Endocrinology, P.C. is an endocrinology practice with offices located at 3320 Skyway Dr., Opelika, Alabama 36801 and 1400 Bradley Lake Blvd, Columbus, Georgia, 31904.  Its primary physician is Dr. Bantwal Baliga (NPI 1730272584), who also practices at Defendant Baliga Family Practice, P.C. East Alabama Endocrinology contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs.  East Alabama Endocrinology can be served with process by its registered agent Robert Lomax located at 1609 McIntosh Creek Road, Phenix City, Alabama 36867.

38.     Defendant Heart of Georgia Primary Care, LLC is a cardiology practice with a principal address of 911 Plaza Avenue, Eastman, Georgia 31023.  Its primary physician involved in the Remote Patient Monitoring and Chronic Care Management services is Dr. Michael Peacock (NPI 1487636742).  Heart of Georgia Primary Care contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs.  Heart of Georgia Primary Care can be served with process by its registered agent Amy Cravey located at 3637 Abbeville Hwy, Eastman, Georgia, 31023.

39.     Defendant Lifeline Primary Care, Inc. is a primary care practice with a principal address of 4025 Lawrenceville Highway NW, Suite A, Lilburn, Georgia 30047. Its primary physician involved in the Remote Patient Monitoring and Chronic Care Management services is Dr. Aziz Pirani (NPI 1760622096). Lifeline Primary Care transacts business in the Northern District of Georgia and the State of Georgia and contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs. Lifeline Primary Care can be served with process by its registered agent Dr. Pirani located at 4025 Lawrenceville Highway NW, Suite A, Lilburn, Georgia 30047.

40.     Defendant Locust Grove Family Medicine, PC is a family medicine practice with a principal address of 3778 Highway 42 South, Locust Grove, Georgia 30248. Its primary physician involved in the Remote Patient Monitoring and Chronic Care Management services is Dr. Nimisha Trivedi (NPI 1629074299). Locust Grove Family Medicine transacts business in the Northern District of Georgia and the State of Georgia and contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal

healthcare programs. Locust Grove Family Medicine can be served with process by its registered agent Dr. Trivedi located at 118 Gillson Drive, McDonough, Georgia 30253.

41.     Defendant Professional Associates of Jackson LLC is an internal medicine practice with a principal address of 2105 West County Line Road Suite #4, Jackson, New Jersey 08527. Its primary physicians involved in the Remote Patient Monitoring and Chronic Care Management services are Dr. Mukesh Shah (NPI 1801867395) and Dr. Sanjay Kumar. Professional Associates of Jackson contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal healthcare programs.

42.     Defendant Stone Mountain Family Practice, P.C. is a family medicine practice with a principal address of 1183-A South Hairston Road, Stone Mountain, Georgia 30088. Its primary physician involved in the Remote Patient Monitoring and Chronic Care Management services is Dr. Rohit Desai (NPI 1548258924). Stone Mountain Family Practice transacts business in the Northern District of Georgia and the State of Georgia and contracts with Health Wealth Safe, Inc. and Medical Office Force LLC to provide Remote Physiological Monitoring Services and Chronic Care Management Services to its patients that are reimbursed by federal

healthcare programs.  Stone Mountain Family Practice can be served with process by its registered agent Charles Day located at 9 Trammell Street, Marietta, Georgia 30064.

## THE LAW

### A.    The False Claims Act

43.    During all times relevant to the facts of this case, the False Claims Act provides in pertinent part that:

(a)(1) any person who —

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), ...(G);
>
> * * * *
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit  money or property to the Government,
>
> * * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the

Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.

\* \* \* \*

(b) DEFINITIONS. — For purposes of this section —

(1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud;

(2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

(3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

### B.    The Georgia False Medicaid Claims Act

44.    The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et*

*seq.*, imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.1.

45.    The civil penalties for violating the statute are:

consistent with the civil penalties provision of the federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public law 101-410), and as further amended by the federal Civil Penalties Inflation

Adjustment Improvements Act of 2015 (Sec. 701 of Public Law 114-74), plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

*Id.*

46. Under O.C.G.A. § 49-4-168, "knowing" and "knowingly" require no proof of specific intent to defraud and mean that a person, with respect to information:

    (A) Has actual knowledge of the information;

    (B) Acts in deliberate ignorance of the truth or falsity of the information; or

    (C) Acts in reckless disregard of the truth or falsity of the information.

47. The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." O.C.G.A. § 49-4-168(3).

48. The statute defines "claim" as:

any request or demand, whether under a contract or otherwise, for money, property, or services, which is made to the Georgia Medicaid program, or to any officer, employee, fiscal intermediary, grantee or contractor of the Georgia Medicaid program, or to other persons or entities if it results in payments by the Georgia Medicaid program, if the Georgia Medicaid program provides or will provide any portion of the money or property requested or demanded, or if the Georgia Medicaid program will reimburse the contractor, grantee, or other recipient for

any portion of the money or property requested or demanded. A claim includes a request or demand made orally, in writing, electronically, or magnetically. Each claim may be treated as a separate claim. O.C.G.A. § 49-4-168(1).

## C. The Anti-Kickback Statute

49. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal statute that makes it illegal for individuals and entities to knowingly and willfully solicit or receive "any remunerations (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind... in return for purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or part under a Federal healthcare program." 42 U.S.C. § 1320a-7b(b)(1).

50. The Anti-Kickback Statute also makes it illegal for individuals or entities to knowingly and willfully offer or pay "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person ... to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

51.	"Remuneration" under the Anti-Kickback Statute refers to an exchange of anything of value, including any kickback, bribe, or rebate, whether paid directly or indirectly, overtly or covertly, in cash or in kind. *See* 42 U.S.C. § 1320a-7b(b)(2).

52.	Violation of the Anti-Kickback Statute is a felony punishable by fines and imprisonment and can result in exclusion from participation in federal healthcare programs. 42 U.S.C. § 1320a-7b(b); 42 U.S.C. § 1320a-7b(7).

53.	Underscoring the breadth of the statutory definition, the United States Department of Health and Human Services, Office of Inspector General ("HHS OIG") Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever." *See* HHS-OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991); *accord United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

54.	The Anti-Kickback Statute prohibits any arrangement in which at least one purpose of the remuneration is to induce referrals of patients for items or services paid for by federal healthcare programs. *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985).

55.     No exceptions or safe harbors to the Anti-Kickback Statute apply to the remuneration offered, paid, solicited, or received among Defendants in exchange for the referral of patients for RPM and CCM services.

56.     Compliance with the Anti-Kickback Statute is material the government's decision to pay for Medicare and Medicaid claims.

### D.     *The Health Insurance Portability and Accountability Act of 1996*

57.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §1320d-6(a), makes it illegal to knowingly:

(1)   use[] or cause[] to be used a unique health identifier;

(2)   obtain[] individually identifiable health information relating to an individual; or

(3)   disclose[] individually identifiable health information to another person."

58.     HIPAA contains stiff penalties:

**(b) PENALTIES.** A person described in subsection (a) shall—

**(1)** be fined not more than $50,000, imprisoned not more than 1 year, or both;

**(2)** if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

**(3)** if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial

advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

42 U.S.C. §1320d-6(b).

59.　The Government also imposes civil penalties for improper disclosures of protected health information. *See* 42 U.S.C. §1320d-5(a)(1).

60.　45 C.F.R. §164.502 prohibits covered entities or business associates from "us[ing] or disclos[ing] protected health information" unless otherwise permitted in the regulations.

61.　45 C.F.R. §164.502(a)(5)(ii)(A) prohibits covered entities from selling protected health information.

62.　45 C.F.R. §164.502(a)(5)(ii)(B)(1) defines "sale" as any disclosure where "the covered entity or business associate directly or indirectly receives remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information."

63.　Further, regulations make clear that the patient's authorization is required prior to sharing his protected health information. "Except as otherwise permitted or required by this subchapter, a covered entity may not use or disclose protected health information without an authorization that is valid under this section." 45 C.F.R. §164.508(a)(1).

64.　In addition, the regulations state:

**(3)** *Authorization required: Marketing.*

(i)     Notwithstanding any provision of this subpart, other than the transition provisions in § 164.532, a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of:

> (A)  A face-to-face communication made by a covered entity to an individual; or
>
> (B) A promotional gift of nominal value provided by the covered entity.

(ii)  If the marketing involves financial remuneration, as defined in paragraph (3) of the definition of marketing at § 164.501, to the covered entity from a third party, the authorization must state that such remuneration is involved.

45 C.F.R. §164.508(a)(3).

### E.     The Paycheck Protection Program

65.     On March 27, 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which created the Paycheck Protection Program ("PPP").

66.     The PPP is a multi-billion-dollar loan guarantee program. To obtain a PPP loan, borrowers must make several good-faith certifications to the Small Business Administration. *See* CARES Act § 1102(a)(2)(G)(i)(I)-(IV).

67.     The CARES Act includes formulas to determine the maximum loan amount under the PPP. Those formulas depend largely on payroll costs incurred during the preceding twelve-month period. *See id.* § 1102(a)(2)(E). In short, the

higher the borrower's payroll costs, the higher a loan the borrower can obtain. A borrower must include their average monthly payroll in their PPP application.

68. As a part of that application, the borrower must make a "good faith certification," among other things, that (a) the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the recipient; and (b) the funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments. *Id.* § 1102(a)(1)(G)(i).

69. The CARES Act also allows for loan forgiveness under certain circumstances. In applying for loan forgiveness, a loan recipient must provide certain financial documentation (including transcripts of accounts and documents verifying payments on covered obligations) and must certify that the "documentation presented is true and correct." *Id.* § 1106(e).

70. The CARES Act also defines allowable uses for covered loans under the PPP. *See id.* § 1102(a)(2)(F). In particular, the statute provides that the proceeds of a covered loan must be used to cover payroll costs, costs related to the continuation of group healthcare benefits and insurance premiums, employee compensation, payments of interest due on mortgage obligations, rent, utilities, and interest on other debt obligations that were incurred before the covered period. *Id.*

71. The loan application form requires certification, among other things, that "[a]ll . . . loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules"; and that "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."

72. The PPP loan application form requires the applicant's representative to certify, by marking with his or her initials next to each item, that (among other things) (a) the loan request is "necessary to support the ongoing operations of the Applicant"; (b) that the "funds will be used to retain workers and maintain payroll [] or make payments" for covered expenses and will not be "knowingly used for unauthorized purposes"; and (c) that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

73. The applicant's representative also must acknowledge, again by marking his or her initials next to each item, that "the Lender will confirm the eligible loan amount using required documents submitted" and that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

74.   Although the PPP is a fairly new program, the DOJ has already prosecuted dozens of cases regarding the program, including cases involving falsified documents, false statements, or misuse of loan proceeds. In September 2020, the DOJ announced that the PPP is a "particular focus" for law enforcement.[1] Similarly, in February 2021, Acting Assistant Attorney General Brian M. Boynton highlighted DOJ's efforts to "identify, monitor, and investigate the misuse of critical pandemic relief monies" and stated that relevant "schemes will likely include false representations regarding eligibility, misuse of program funds, and false certifications pertaining to loan forgiveness."[2]

## FEDERAL HEALTHCARE PROGRAMS

### A.   The Medicare Program

75.   In 1965, Congress enacted Title XVIII of the Society Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. *See* 42 U.S.C. §§ 1395, *et seq.* Medicare is a federal healthcare

---

[1] UNITED STATES DEPARTMENT OF JUSTICE, *Acting Assistant Attorney General Brian Rabbitt Delivers Remarks at the PPP Criminal Fraud Enforcement Action Press Conference*, https://www.justice.gov/opa/speech/acting-assistant-attorney-general-brian-rabbitt-delivers-remarks-ppp-criminal-fraud (last visited Sept. 30, 2021).

[2] UNITED STATES DEPARTMENT OF JUSTICE, *Acting Assistant Attorney General Brian M. Boynton Delivers Remarks at the Federal Bar Association Qui Tam Conference*, https://www.justice.gov/opa/speech/acting-assistant-attorney-general-brian-m-boynton-delivers-remarks-federal-bar (last visited Sept. 30, 2021).

program providing benefits to persons who are over the age of 65 and some under that age who are blind or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

76. Medicare consists of four parts. 42 U.S.C. §§ 1395c-1395i. Part B ("Supplementary Medical Insurance for the Aged and Disabled") generally covers, *inter alia*, physicians' services, services and supplies incident to physicians' services, and diagnostic tests. *See* 42 U.S.C. § 1395k.

77. As alleged herein, Defendants submitted, or caused to be submitted, false claims under Medicare Part B.

78. To participate in Medicare, providers must certify that their services are provided economically and only when and to the extent medically required, or that the services are "reasonable and necessary." 42 U.S.C. § 1395n; 42 U.S.C. § 1395y(a)(1)(A); and 42 C.F.R. § 424.24(g)(1).

79. Medicare only pays for Part B services that are actually rendered and that are "reasonable and necessary for the diagnosis of or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). *See also* 42 C.F.R. § 415(k)(1) and Section 1862(a)(1) of the Social

Security Act, CMS Manual System, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 16, § 20

80. Medicare establishes its national payment policy for covered items or services through national coverage determinations, which are formal decisions by the Secretary of Health and Human Services regarding whether, and under what circumstances, Medicare covers a particular item or service as deemed medically necessary for a patient. *See* 42 U.S.C. § 1395ff(1); 42 C.F.R. § 405.1060(a).

81. To assist in the administration of Part B, CMS contracts with Medicare Administrative Contractors ("MACs") to administer and pay Part B claims submitted by healthcare providers from the Medicare Trust Fund. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100. Providers submit claims for payment to MACs on behalf of Medicare beneficiaries, and in turn, the MACs process and pay those claims.

82. In order to bill Medicare, a provider must submit an electronic or hard-copy claim called a CMS-1500 or submit claims electronically using the 837P format ("837P"). When the provider submits the CMS-1500, the provider must certify that the services in question were "medically indicated and necessary for the health of the patient," that the information on the claim form is "true, accurate, and complete," and that the provider understands that "payment and satisfaction of this

claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." Providers must further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the [AKS]."

83. Providers who submit claims electronically under 837P must also execute an Electronic Data Interchange ("EDI") Enrollment Form with CMS. By executing the EDI Enrollment Form, a provider agrees to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful."

84. By executing an EDI Enrollment Form, a provider also acknowledges "that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

85. Among the information the provider includes on a CMS 1500 form or the 837P are certain five-digit codes, including Current Procedural Terminology ("CPT") codes and Healthcare Common Procedure Coding System ("HCPCs")

codes, that identify the diagnosis, services rendered and for which reimbursement is sought, and the unique billing identification number of the rendering provider and the referring provider or other source. 45 C.F.R. §162.1002(a)-(b).

86.     Providing accurate CPT and HCPCs codes on claims submission forms is material to and a condition of payment for federal healthcare programs. *See, e.g.,* Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

87.     Because it is not feasible for Medicare personnel to review every patient's medical record for millions of claims for payment they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

88.     Generally, once a provider submits the CMS-1500 or electronic 837P to Medicare, the claim is paid directly to the provider without any review of supporting documentation.

### B.     *The Medicaid Program*

89.     The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children. The Medicaid Program is a jointly funded

federal-state program and is administered by CMS at the federal level. Within broad federal rules, each state determines eligibility requirements for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

90.    In order to qualify for federal funds, each state, including Georgia, is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute. *See* 42 U.S.C. § 1396a.

91.    Individuals and entities that want to be reimbursed by Medicaid for services provided to beneficiaries must first enroll with Medicaid by submitting an application to the applicable state organization that administers the Medicaid program, or one of its authorized contractors.    If the applicant meets the requirements for enrollment, she is then eligible to be paid for qualifying services.

92.    Medicaid providers submit claims for payment to states, which pay the claims and obtain the federal portion of the payment from accounts that draw on the United States Treasury. After the end of each calendar quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual

expenditures). 42 C.F.R. §§ 430.0–430.30 (2018). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

93. As under Medicare, a claim under Medicaid is only reimbursable if it is "reasonable and necessary for diagnosis or treatment of illness or injury to improve the functioning of a malformed body member." 42 C.F.R. § 402.3.

94. Typically, prospective providers certify that they must abide by all Federal and State regulations governing the Medicaid program to enroll as a Medicaid provider.

95. All enrolled Medicaid providers are obligated to abide by these policies and procedures, and all providers expressly certify their compliance. Among the requirements are that provider must comply with all State and Federal laws and regulations related to furnishing Medicaid services and must not bill for any services not performed or delivered in accordance with all applicable state policies.

96. The Georgia Department of Community Health ("DCH") is responsible for the administration and supervision of the Medicaid program. Georgia law authorizes DCH "to establish such rules and regulations as may be necessary or desirable in order to execute the [S]tate [P]lan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the [S]tate [P]lan . . . ." O.C.G.A § 49-4-142(a). Georgia law also authorizes and

requires DCH to "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of services authorized under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated to providers enrolled in the applicable category of service, and amendments thereto are effective "as specified by the Department at the time of dissemination." *Id*. Thus, DCH sets the rules for the provision of medical services to Georgia Medicaid recipients, the circumstances in which providers can become enrolled in Georgia Medicaid, and how Georgia Medicaid reimburses providers for these claims.

97. All Georgia Medicaid providers that submit claims electronically must complete an Electronic Funds Transfer Agreement and agree to the following:

> Legal Compliance. Provider shall abide by all federal and state laws governing the Medicaid program.

> * * * *

> Provider further acknowledges and agrees that only Payees who have agreed in writing to: 1) comply with all Department policies regarding the payment of medical assistance; and 2) be subject to the recoupment policies outlined in the Provider's Statement of Participation and as set forth in the Power of Attorney for Electronic Claims Submission, shall be deemed acceptable Payees.

> * * * *

> Provider certifies by such acceptance [of funds] that

> Provider presented the claims for the services . . . and that the services were rendered by or under the supervision of Provider. Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws.

Georgia Department of Community Health Electronic Funds Transfer Agreement.

98.    At all times relevant to the Complaint, in order to receive payment for Medicaid services, a provider must first enroll in the Georgia Medicaid program and enter into a provider agreement with the State called a "Statement of Participation." Among the express understandings in the Statement of Participation include the following:

> Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II, and the applicable Part III manuals.

> * * * *

> Claims Submissions: Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness . . . .

> * * * *

> Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents,

medical records, identifying recipient data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided.

* * * *

Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of services indicated in the Provider Enrollment documents. By submitting claims for reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims.

* * * *

Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered . . . for which federal financial participation is not available.

* * * *

Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup, or recover payments as a result of Provider's failure to abide by the Department's requirements.

Department of Community Health Division of Medical Assistance, Statement of

Participation, DMA-002 (Rev. 04/03).

99. Therefore, Defendants understood that Georgia Medicaid may withhold payment for claims submitted in violation of the Policies and Procedures manuals, incomplete or untruthful claims, unsubstantiated claims, inaccurate claims, claims submitted in violation of law, and claims submitted for which federal financial participation is not available.

100. The Part I Medicaid/PeachCare for Kids Manual, "[a]long with the Statement of Participation, . . . encompasses the terms and conditions for receipt of reimbursement." Georgia Department of Community Health (DCH), Part I Policies and Procedures for Medicaid/PeachCare for Kids, at "Preface" (April 1, 2019). The Part I Manual reiterates and reemphasizes the importance the State of Georgia places on compliance and further delineates the specific conditions placed on providers submitting claims. For example, according to the Part I Manual, each enrolled provider must:

> B) Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

> * * * *
> G) Not engage in any act or omission that constitutes or results in over utilization of services.

> * * * *

J) Neither bill the Division for any services not performed or delivered in accordance with all applicable policies . . . .

*Id.* at R. 106, p. I-43-44 (Emphasis added).

### C. *Remote Physiological Monitoring Services*

101.  Medicare began reimbursing for RPM services in 2018.

102.  At least 30 state Medicaid programs have some form of reimbursement for RPM services.

103.  RPM services involve the use of medical devices to collect physiologic data that is analyzed and used to develop and manage a patient's treatment plan for a chronic and/or acute health illness or condition.

104.  The type of data that is captured and monitored may include a patient's vital signs, blood sugar levels, weight, blood pressure, and blood oxygen levels.

105.  RPM services must be reasonable, necessary, and "used to develop and manage a treatment plan related to a chronic and/or acute illness or condition." https://www.cms.gov/files/document/12120-pfs-final-rule.pdf

106.  The CPT codes associated with RPM services are considered Evaluation and Management (E/M) services; therefore, RPM services can only be ordered and billed by physicians or non-physician practitioners who are eligible to bill Medicare for E/M services.

40

107. While CMS has clarified that auxiliary personnel may furnish RPM services, the auxiliary personnel must be under the general supervision of the billing physician or practitioner.

108. On November 2, 2017, CMS first started reimbursing for RPM services using CPT Code 99091.

109. On January 1, 2019, CMS approved the following new CPT Codes for RPM services:

- CPT Code 99453: remote monitoring of physiologic parameter(s) (e.g., weight, blood pressure, pulse oximetry, respiratory flow rate), initial; set-up and patient education on use of the equipment (unless a patient has a suspected or confirmed case of Covid-19, CPT 99453 shall not be reported if the monitoring lasts for less than 16 days);

- CPT Code 99454: remote monitoring of physiologic parameter(s) (e.g., weight, blood pressure, pulse oximetry, respiratory flow rate), initial; each 30 days;

- CPT Code 99457: remote physiologic monitoring treatment management services, clinical staff/physician/other qualified healthcare professional time in a calendar month requiring interaction communication with the patient/caregiver during the month; initial 20 minutes ; and

- CPT Code 99458: additional 20 minutes

110. According to CMS, "[t]he medically necessary services associated with all the medical devices for a single patient can be billed by only one practitioner,

only once per patient per 30-day period, and only when at least 16 days of data have been collected."

111. Medicare requires the provider to obtain the patient's consent for the RPM services including an acknowledgement that the beneficiary will be responsible for a co-payment. The patient's consent must be documented in the record.

112. According to the CPT Instructions for the RPM codes, "the device used must be a medical device as defined by the FDA." CPT 2020 Professional Edition, p. 42.

113. Section 201(h) of the Food, Drug and Cosmetic Act defines a "medical device" broadly as one that is "intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease."

114. The 21st Century Cures Act, passed in 2016, identified certain medical software functions that are specifically excluded from the definition of a "medical device" and hence, from FDA regulation. They include:

- Software intended for administrative support of a health care facility;
- Software intended for maintaining or encouraging a healthy lifestyle;
- Software intended to serve as electronic patient records; and
- Software intended for transferring, storing, converting formats, displaying data and results.

115. On September 27, 2019, the FDA issued further guidance entitled *Changes to Existing Medical Software Policies Resulting from Section 3060 of the 21st Century Cures Act*. The FDA identified 21 types of software functionality that are deemed <u>not</u> to be a medical device, including but not limited to:

- Mobile apps that allow a user to record (i.e., collect and log) data, such as blood glucose, blood pressure, heart rate, weight, or other data from a device to eventually share with their health care provider or upload to an online (cloud) database, personal health record, or electronic health record that is certified under the ONC Health IT Certification Program.

- Software that enables patients or health care providers to interact with a certified personal health record (PHR) EHR.

https://www.fda.gov/media/109622/download.

116. While the device does not have to be prescribed by a physician, the medical device must digitally (defined by CMS as "automatically") upload patient physiologic data ("data are not patient self-recorded and/or self-reported") and the data must be "reasonable and necessary for the diagnosis or treatment of the patient's illness or injury or to improve the functioning of a malformed body member." The device must also be used to collect and transmit reliable and valid physiologic data that allow understanding of a patient's health status in order to develop and management a plan of treatment.

117. CMS initially required the healthcare provider ordering the RPM services to have an established patient relationship with the beneficiary. During the

COVID-19 Public Health Emergency, however, CMS waived this requirement and instead permits healthcare providers to bill for RPM services for new patients.

### D. Chronic Care Management Services

118. Medicare beneficiaries who have two or more chronic conditions expected to last at least 12 months or until the death of a patient are eligible for Chronic Care Management ("CCM") services.

119. CMS requires providers to obtain patients' consent before starting CCM services, including informing the patients about applicable cost-sharing and the right to end services.

120. Only one practitioner can provide and bill CCM services for each month.

121. Providers must establish, implement, revise, and/or regularly monitor in an electronic format a Comprehensive Care Plan, including but not limited to the patient's problem list, expected outcomes and prognosis, measurable treatment goals, symptom management, planned interventions and responsibilities, and medication management.

122. Healthcare providers must furnish 20 minutes of CCM services during the 30-day billing period. 79 Fed. Reg. 67548, 67716 (Nov. 13, 2014).

123. CCM services are intended to be intensive. For example, providers must provide CCM patients with: (1) 24-hour-a-day, 7-days-a-week access to address the patient's acute chronic care needs; (2) continuity of care with a designated practitioner or member of the care team with whom the patient is able to get successive routine appointments; (3) care management including systematic assessment of the patient's medical, functional, and psychological needs, system-based approaches to ensure timely receipt of all recommended preventative care services, medication reconciliation, and oversight of patient self-management of medications; (4) development of a care plan; (5) referrals to other clinicians, follow-up after emergency department visits or other discharges from the hospital, SNF, or other healthcare facility, and provision of transitional care between healthcare settings; and (6) coordination with home and community-based providers.

124. The CPT codes providers may use to bill for CCM services include:

- CPT Code 99487: 60 minutes of complex CCM services provided by a provider or directed by a provider;

- CPT Code 99489: each additional 30 minutes of clinical staff time for complex CCM services;

- CPT Code 99490: non-complex CCM services provided for 20 minutes by clinical staff at the direction of a provider;

- CPT Code 99491: non-complex CCM services provided by a physician or nurse practitioner directly for at least 30 minutes per month;

- CPT Code 99495: communication with the patient or caregiver following discharge involving moderate complexity; and

- CPT Code 99496: communication with the patient or caregiver following discharge involving high complexity.

## FACTUAL ALLEGATIONS

125. "If Dr. Agrawal is involved, it can't be legal." This was an ominous warning Relator Moore received after pitching Health Wealth Safe's RPM and CCM services to a well-respected cardiologist in the Atlanta metropolitan area. Relators Chavous, Dunlay, and Moore ultimately learned that the cardiologist was correct.

### A.    The Physician and the myRemoteCheckup Application

126. Defendant Dr. Agrawal is a board-certified cardiologist, internist, sleep medicine, and pain management practitioner. In addition to serving as the Chief Executive Officer and Chief Financial Officer of Defendant Health Wealth Safe, Inc. and the Founder of Defendant Medical Office Force, LLC, Dr. Agrawal is the Chief Executive Officer and Chief Financial Officer of Athens Heart Center, P.C., the Founder and Chairman of Doctors ACO, LLC., an accountable care organization, and the founder of Family First Healthcare Pain Management, LLC, a pain medicine provider in Athens, Georgia.

127.   Dr. Agrawal also claims to have started a non-profit organization called Physicians Circle of patients, which allegedly helps low-income patients pay for medical devices.  https://medicalofficeforce.com/about/

128.   Despite wearing so many hats, when Medicare began reimbursing for RPM services in 2018, Dr. Agrawal jumped at the opportunity and established Health Wealth Safe, Inc.

129.   Over time, Relators believe Dr. Agrawal became one of the top billers nationwide for RPM and CCM services.

130.   Medical Office Force was already in existence as it also handled the billing for Defendant Athens Heart Clinic.  Medical Office Force has a sophisticated propriety software billing system that can very easily generate a detailed report of all services billed for the Physician Practice Defendants for RPM and CCM services.

**B.    *The Kickback Pitch***

131.   Under the guise of attempting to reduce the costs associated with emergency services provided to patients suffering from chronic disease, Health Wealth Safe offered the Physician Practice Defendants kickbacks to enroll their patients in Health Wealth Safe's myRemoteCheckup application through which they claimed to deliver RPM and CCM services.

132. Initially, Dr. Agrawal and Health Wealth Safe told the Physician Practices Defendants that they would be paid $2,000 per patient per year, taking money for their practice that otherwise "would have gone to the hospital."

133. Today, Health Wealth Safe projects that their "partner" physicians will receive up to "$800 in new revenue per patient per month." https://healthwealthsafe.com/become-a-partner/

134. Health Wealth Safe told the Physician Practice Defendants that, through its myRemoteCheckup app, Health Wealth Safe would provide the practice's patients with RPM services and follow escalation protocols created by the Physician Practice Defendants to notify the provider of their patients' out-of-range responses from their RPM monitoring devices.

135. Health Wealth Safe promised the Defendant Physician Practices, "Within 90 days of partnering with us, you will receive your first check, providing your practice with additional revenue."

136. Health Wealth Safe's management trained its sales employees to describe the RPM services by saying, "We provide partner physicians with a complete remote patient monitoring solution optimizing Medicare codes. There is absolutely no financial investment and we bill insurers on your behalf."

137. The sales personnel were specifically trained to ask the physician practices what percentage of their patients were covered by Medicare.

138. Sales personnel were also trained to describe the current landscape of RPM services as, "You will essentially be reimbursed for services you were already performing for free" as this was a way to "increase revenue with no financial investment."

139. In fact, Relators heard this described and pitched by Health Wealth Safe as passive income for the Defendant Physician Practices.

140. Health Wealth Safe required the Defendant Physician Practices to let them do the billing because, "[O]ver the past couple of years, not only ha[s] [Health Wealth Safe] learned the BEST methods to engage with your patients and [sic] [Health Wealth Safe] ha[s] also learned how to bill Medicare and other insurers to ensure that you get paid." Health Wealth Safe offered these billing services for free, "Because if you don't get paid… we don't get paid."

141. Health Wealth Safe's sales training highlighted four benefits to the billing services they provided "with no out-of-pocket cost[s]" to the physician practice:

> 1. You will be able to receive reimbursements faster, possibly within 2 to 4 weeks.

> 2. No hassling with patients about RPM/CCM bills.

3. No hassles with denials.

4. Prior to billing, we monitor the patient's annual deductible to make sure that it has been met so that the patient does not have out-of-pocket expenses.

142.   Health Wealth Safe did not stop with this initial kickback.  Instead, it offered additional kickbacks as the relationships continued.  For example, Health Wealth Safe established a Friends & Family Referral Plan under which Health Wealth Safe rewarded the Physician Practice Defendants that referred new physician practices to the program by paying them $3,000 for the first billable patient enrolled from the new practice and an additional $3,000 for each additional 250 enrolled billable patients.

143.   Health Wealth Safe developed promotional handouts describing their scheme and highlighting the additional revenue the practice would receive for referring their patients:

# Increase Your Revenue



 We provide partner physicians with a **complete** remote patient monitoring service optimizing Medicare codes. There is absolutely no financial investment and **we** bill insurers on their behalf.



CPT Code 99453 $21 Initial Set Up → CPT Code 99454 **$65** Device/Transmission + CPT Code 99457 **$52** Patient Monitoring = **$117*** Patient / Month

*Figure does not include billing of secondary insurers.



Patient / Month Minus $60 Monthly Fee → **$57** × 12 Months = **$684** Patient / Year

 **25%** of Patients will require CPT Code 99458 for **each** additional 20 minutes of physiologic monitoring.

* Not included in the $117 patient / month total above.

CPT Code 99458 **$60** Additional 20 Minutes

 When myRemoteCheckup escalates a patient to the practice, the physician or PA should call the patient.

The call becomes a **telemedicine consultation** and the practice may bill for additional revenue.

Telemedicine is billed by the practice and not by myRemoteCheckup.

**$90+**





## Billing
**We bill insurers on your behalf**



## Simplicity
**We send you a monthly check**



## Experience
**Satisfying Patients and Physicians since 2018**



## Patient Engagement
**We provide patient support & intervention**

# Potential Revenue By Partnering With





| Enrolled Patients | $57 for Practice per Month | 25% of Patients Require Extra Monitoring per Month | $ for Practice per Year |
|---|---|---|---|
| 100 | $5700 | $1500 | $69,900 |
| 250 | $14,250 | $3750 | $216,000 |
| 500 | $28,000 | $7500 | $426,000 |
| 750 | $42,750 | $11,250 | $648,000 |
| 1000 | $57,000 | $15,000 | $702,000 |
| 1250 | $71,250 | $18,750 | $1,080,000 |
| 1500 | $85,500 | $22,500 | $1,296,000 |
| 2000 | $114,000 | $30,000 | $1,728,000 |

- Enrolled Patients- # of enrolled Medicare patients using myRemoteCheckup.
- $ for Practice per Month- Estimated total from Increase Your Revenue sheet.
- 25% Extra Required Monitoring- Estimated number of patients who will require an additional 20 minutes of monitoring. Code 99458 pays $60.
- $ for Practice per Year- $57 ÷ 25% Enrolled Patients @ $60 each x 12

### C.    The Contract

144.   Health Wealth Safe, the Physician Practice Defendants, and Medical Office Force, LLC entered into Standard Services Agreements.

145.   The agreements formalized the process and unequivocally enumerated the Physician Practice responsibilities:

---

**PHYSICIAN'S PRACTICE AGREES TO:**

1. Identify patients who need Telehealth/Remote Patient Monitoring Service and obtain face to face consent as defined by CMS.
2. Provide admin-level access to Electronic Practice Management Software/Electronic Medical Records (EMR)/Electronic Health Records (EHR) with the goal of retrieving patient demographics and insurance information in a CCDA or comma separated format for identifying eligible patient for Telemedicine Remote Patient Monitoring and prepared for the "Rapid Enrollment" phase of RPM.
3. Provide credentialing access or information for the reassignment of billing benefits to Service Provider and Medical Office Force, LLC.
4. Assign billing benefits to the Service Provider and Medical Office Force.
5. Provide high speed internet access at the practice to the patient for downloading of appropriate APP's and training.
6. Provide high speed internet and a working space for remote trainer with computer access to the practice's Electronic Practice Management Software/Electronic Medical Records (EMR)/Electronic Health Records (EHR) for a rapid enrollment phase of 90 days.
7. Provide needed follow up to patients as necessary during Remote Patient Monitoring.
8. Provide, in writing, Escalation Protocols to Service Provider for patients.
9. Provide Voice Shot recording for RPM Rapid Enrollment.
10. Determine and confirm date for Training with all physicians present.
11. Attend initial 30, 60, and 90 day reviews during the 90 day RPM Rapid Enrollment.
12. Attend Quarterly Reviews with Service Provider.

---

146.   Health Wealth Safe, in turn, agreed to perform the following:

**SERVICE PROVIDER AGREES TO:**

1. Commence the provision of the Services within 30 days of the date of this agreement.
2. Provide Telehealth/Remote Patient Monitoring services (RPM), as defined by The Centers for Medicare and Medicaid Services (CMS).
3. Provide personnel for 2 weeks (agreed upon predetermined dates) to enroll and educate patients about the Service Provider program. The Service Provider will provide the monitoring equipment such as a blood pressure monitor, weight machine, glucose monitor, pulse ox, etc... at no cost to the Patient or the Practice, at the sole discretion of the Service Provider for a suitable patient.
4. Collect biological data electronically from the patient, manage the data, provide alerts, and send information to the Practice based on predetermined patient intervention and escalation protocols.
5. Assign a Practice RPM Navigator to monitor patient use of the product, speak with patients, and provide intervention / escalation where necessary.
6. Provide HIPAA compliant and secure electronic interfaces as required by US Law and Service Provider. The interface will allow the Practice and the assignees to review electronic data.
7. The Service Provider will not, under any circumstance, share The Practice patient information with other individuals or organizations without your permission, including public organizations, corporations, or individuals, except when applicable by law. Service Provider will not sell, communicate, or divulge information to any mailing lists or organization.

147. Medical Office Force was authorized in the agreement, in joint venture with Health Wealth Safe, to provide billing and collection on behalf of the Physician's Practice for Medicare CPT Codes 99453, 99454, 99457, and 99458.

148. The physician practices reassigned billing benefits to Health Wealth Safe and Medical Office Force. Although Health Wealth Safe was obligated to provide the services in accordance with Medicare and Medicaid requirements (which it failed to provide), Medical Office Force falsely billed payors as if the physician practices provided the services (which they did not). This pass-through billing scheme is fraudulent and results in false claims through the misrepresentation of the actual provider.

149. The reimbursements went directly to Health Wealth Safe's partner company, Medical Office Force. After Health Wealth Safe and Medical Office

Force deducted its $60-per-patient-per-month fee, they then would provide the physician practice with the balance of the reimbursements received from Medicare and the other insurance companies. This remuneration paid to the physician practices—per Health Wealth Safe's marketing materials—was in exchange for *nothing* but (1) the practices' patient referrals and (2) the practices' willingness to sell out their patients' Protected Health Information for a profit.

150. Health Wealth Safe cautioned the Physician Practice Defendants that the services will be listed on the patients' Explanation of Benefits Statement, "The patient does not want to pay for this service…we have learned that…but they are happy it is covered by their insurance. They MUST be told it will be on their EOB or they will call us and cancel our lifesaving service."

151. Each of the Physician Practice Defendants entered into a Standard Services Agreement with Health Wealth Safe and Medical Office Force.

**D.     *The Physician Practice Defendants' Involvement in the Scheme***

152. Once the Physician Practice Defendants signed the Standard Services Agreement, Health Wealth Safe required the practice to provide Practice Management Administrative Access, *i.e.*, direct access to the practice's Electronic Medical Records system. This "allow[ed] [Health Wealth Safe] to quickly determine patient eligibility" and "[s]ee significant increases in our Rapid Patient

Enrollment, resulting in increased revenue within 90 days." In practice, Health Wealth Safe would go through the physician practice's patient records and cold call patients to obtain referrals.

153. During these calls, Health Wealth Safe's management trained its employees to tell the patients their physicians wanted them to enroll in the plan.

154. Neither Health Wealth Safe nor the Physician Practice Defendants would obtain proper informed consent to begin providing either RPM or CCM services.

155. Health Wealth Safe would ask the physician practice to record a voice message recruiting its patients for the RPM services. The script read:

> We now offer remote monitoring services called myRemoteCheckup through our partnership with Health Wealth Safe. This helps us take care of you between office visits.
>
> Sometime in the next few days, you will receive a text with a link to download the myRemoteCheckup mobile app. If you don't have a smartphone, you will receive a phone call. Please register as soon as you hear from them.

156. This recording was important because, as Health Wealth Safe explained, it "ensure[d] that patients understand that this is initiated on behalf of the physician."

157. Health Wealth Safe referred to this process as Rapid Enrollment "where [Health Wealth Safe] use[s] the information imported from [the] practice

management software to reduce patient registration time in HWS to just a few minutes."

158. In addition to allowing Health Wealth Safe to look through the physician practice's EMR system for patients, Health Wealth Safe also downloaded the data to upload it directly into Health Wealth Safe's platform and populate into the individual patient profiles.

159. Health Wealth Safe filmed certain partner physicians promoting the myRemoteCheckup application. For example, the following physicians filmed these videos while failing to acknowledge the money their practices received from Medicare as a result of their participation in this scheme:

| Physician | Practice | Promotional Video |
|-----------|----------|-------------------|
| Dr. Bantwal Baliga | East Alabama Endocrinology PC | https://www.youtube.com/watch?v=y0pQsfhCxkM |
| Dr. Millard Collier | Atlanta West Primary Care | https://www.youtube.com/watch?v=4NsZ5nmqxmw |
| Dr. David Blake | Family First Healthcare (Lithia Springs) | https://www.youtube.com/watch?v=c-4QucF2dCg |
| Dr. Darrell Murray | Murray Medical and Wellness Centers | https://www.youtube.com/watch?v=flx5FIBEuU0 |

160. Each of the Physician Practice Defendants gave Health Wealth Safe this access to their EMR systems and referred their patients to Health Wealth Safe for RPM or CCM services.

161.   Included below is a summary snapshot of the number of patients each of the Physician Practice Defendants referred to Health Wealth Safe for either RPM or CCM services at one point during the fraudulent scheme.  Many of these patients were Medicare or Medicaid beneficiaries.  For these beneficiaries, Health Wealth Safe would bill Medicare or Medicaid monthly, obtain reimbursements, and distribute these reimbursements to the Physician Practice Defendants while Health Wealth Safe retained the $60 per patient per month charge:

| Clinic: | Dr. Name: | RPM Only | CCM Only | CCM & RPM | Total Pop: |
|---|---|---|---|---|---|
| Athens Heart Center | Dr. Agrawal | 1113 | 33 | 706 | 1852 |
| Athens Medical Associates | Dr. Butt | 164 | 0 | 8 | 172 |
| Baliga Family Practice | Dr. Baliga | 214 | 5 | 122 | 341 |
| CV Clopton Family Practice | Dr. Clopton | 251 | 0 | 28 | 281 |
| Eagle's Landing Endo | Dr. Watts | 1157 | 1 | 129 | 1292 |
| East Alabama Endocrinology, PC – Columbus | Dr. Baliga | 349 | 10 | 283 | 646 (642) |
| East Alabama Endocrinology, PC - Opelika | Dr. Baliga | 195 | 5 | 141 | 346 |
| Heart Of GA, LLC | Dr. Peacock | 474 | NA | NA | 474 |
| LLPC-Lilburn | Dr. Pirani | 697 | NA | NA | 697 |
| Locust Grove Family Medicine | Dr. Trivedi | 299 | 0 | 50 | 349 |
| Murray Medial and Wellness Centers of Norcross | Dr. Murray | 8 | 0 | 0 | 8 |

| Clinic: | Dr. Name: | RPM Only | CCM Only | CCM & RPM | Total Pop: |
|---|---|---|---|---|---|
| Murray Medical & Wellness Center of Austell | Dr. Murray | 32 | 1 | 2 | 35 |
| Murray Medical and Wellness Centers of Cascade | Dr. Murray | 9 | 0 | 0 | 9 |
| Murray Medical and Wellness Centers of Oakwood | Dr. Murray | 4 | 0 | 1 | 5 |
| Professional Associates of Jackson-Internal Medicine | Dr. Mukesh Shah, Dr. Sanjay Kumar | 239 | NA | 0 | 240 |
| Stone Mountain Family Medicine | Dr. Desai | 149 | 1 | 21 | 171 |

### E. Health Wealth Safe's Failure to Provide Medical Devices

162. Health Wealth Safe claimed in their sales pitch that they would provide the enrolled patients with a Bluetooth device that was compatible with its myRemoteCheckup app at no cost to the patient or the physician practice.

163. Yet, Relators learned that, from at least January 2019 to April 2021, Health Wealth Safe never sent the required devices to its patients.

164. Instead, during this time period, Defendants billed or caused to be billed Medicare and Medicaid (in some instances) for services that either were not rendered or were worthless. And, of course, the Physician Practice Defendants received

kickbacks in the form of purely passive income for referring patients to Health Wealth Safe and for granting Health Wealth Safe access to patient records.

165. Dr. Agrawal and Health Wealth Safe knew their conduct was unlawful. In fact, in its own training documents, Health Wealth Safe claimed that it would send out the devices to patients who had been signed up for two weeks. Further, Health Wealth Safe broke down the responsibilities it would undertake to support the billing of the CPT codes associated with RPM services, including providing devices, training the patients on how to use the devices, and monitoring the data recorded:

> We have broken down the responsibilities for each of these CPT codes into two parts. The Practice's Responsibility and HWS Responsibility.
>
> **99453 ($21.00):** Initial Patient Setup and Education
> - Practice Responsibility: Provide qualified patient for RMP
> - HWS Responsibility: Provide MA to work with practice to get consent, train and educate the patient on using the MyRemoteCheckup application.
>
> **99454 ($69.00):** Provide electronic device, education and training
> - Practice Responsibility: None.
> - HWS Responsibility: Provide MA to work with practice to get consent, train and educate the patient using devices such as a glucometer, weight scale, etc.
> - FYI, we only send the devices out to qualified patients who have been actively engaged in the MyRemoteCheckup app for at least 2 weeks.
>
> **99457 ($53.00):** 20 minutes of data monitoring and response to alerts
> - Practice Responsibility: Practice responds to alert and provides medical care as needed.
> - HWS Responsibility: Service, manage the input of data, monitor the data and alerts, and send alerts to the practice. Provide reports of monthly data collection and billing information.
>
> We also bill for CPT Code 99458 when applicable.
> **99458 ($60.00):** Additional 20 minutes of data monitoring and response to alerts.
> - Practice Responsibility: Practice responds to alert and provides medical care as needed.
> - HWS Responsibility: Service, manage the input of data, monitor the data and alerts, and send alerts to the practice. Provide reports of monthly data collection and billing information.

166. In his YouTube presentation entitled "Remote Therapeutic Monitoring 2022," which was uploaded on January 5, 2022, Dr. Agrawal acknowledges that the RPM codes "require the device to digitally (automatically) record and upload patient physiological data (i.e., data cannot be patient self-recorded, self-reported, or entered manually into the device)." https://www.youtube.com/watch?v=9FvU4ml27uI

167. CMS and the CPT Code Manual require the patient to use a medical device as defined by the FDA that automatically uploads the patient's physiological data. The FDA has made clear that mobile apps into which patients record and log their own data are not medical devices.

168. From 2019 to April 2021, most patients used the myRemoteCheckup to upload their own information and data (e.g., answering questions to provide non-physiological data such as their pain scale or how they were feeling that day) and did not use FDA devices.

169. For example, in a patient promotion video uploaded Health Wealth Safe's Twitter feed on December 16, 2019, Patient L.H., a patient of Athens Heart Clinic, describes "charting" herself through Health Wealth Safe's app. She makes no mention of using any sort of medical device.

https://twitter.com/HWSafe/status/1206647387361566722?s=20&t=IsrV0k4BaNF JZD5OHG1rNQ.

170.   Some patients did not even have the myRemoteCheckup application downloaded – for these patients, Health Wealth Safe navigators called them and simply orally asked them the questions found in the app.

171.   Relators observed that it was rare for the patients to have their own devices to be able to record data such as their blood pressure, oxygen level, sugar level, or weight.  The patients, and in turn the myRemoteCheckup application, were not providing any sort of data that could be "used to develop and manage a treatment plan related to a chronic and/or acute illness or condition" as required by law.

172.   All of claims submitted under any of the CPT Codes for RPM services during this time period would constitute false claims.

173.   The purpose of CPT Code 99453 in particular is to reimburse for the initial set up of the device and patient education for the use of the equipment.  Since Defendants were not distributing devices, all false claims billed under CPT Code 99453 during this time period were especially egregious.

### E.   Even with Devices, RPM Services Failed to Meet the Requirements

174.   After repeated complaints by Relators, other employees, and others, Dr. Agrawal and Dawn Dobbs finally agreed to provide medical devices to the patients.

175.   Health Wealth Safe never refunded the government for the 2 ½ years' worth of claims without the RPM devices.

176. Furthermore, problems continued with Health Wealth Safe's delivery of the RPM services on the physicians' behalf. For example, Health Wealth Safe never developed a process for documenting the patients' informed consent to begin the services.

177. And once deployed, Health Wealth Safe continued to dupe the patients. The app had a "Messages" section, and Health Wealth Safe told the Physician Practice Defendants the patients "are not aware that [Health Wealth Safe]'s team of navigators will intercept the messages first to filter and see if escalation to the physician is appropriate" based on the practice's escalation procedures. Health Wealth Safe's navigators were hourly employees with no clinical background, training, or licensures.

178. In practice, Health Wealth Safe never developed practice-specific escalation procedures with the Physician Practice Defendants. The physicians responsible at the Physician Practice Defendants failed to properly supervise the navigators in their delivery of the RPM services.

179. In addition, according to Health Wealth Safe's own training modules, the navigators only checked to make sure the patients engaged with the app 1 day a month, not the 16 days per month as required by CMS requirements. CPT Code

99454 specifically requires these 16 separate days of using the device, so all claims submitted under CPT Code 99454 are fraudulent.

180. Further, CPT Code 99457 requires 20 minutes spent monitoring the patient and actually interacting and communicating with the patient.

181. CPT Code 99458 is for any additional 20 minutes spent in real-time conversation with the patient.

182. Defendants' system automatically processed both CPT Codes 99454 and 99457 together *any time* a patient's questions were inputted into the system either by the patient using the myRemoteCheckup app or by the navigators asking the patient questions over the telephone, regardless of the amount of time spent. If Defendants did not spend 20 minutes with the patient or record data for 16 days, these claims are false.

183. Further, Defendants' system automatically processed CPT Code 99458 after *any* additional time was spent with the patient rather than only billing this claim after Defendants met the 40 minute-minimum requirement. These are false claims.

184. Most importantly, Defendants did not document in the patients' records how the data was "used to develop and manage a treatment plan related to a chronic and/or acute illness or condition" as required by law.

### F.  Issues with CCM Services

185.  Defendants' delivery of the CCM services was similarly problematic.

186.  Defendants failed to obtain the patients' consent prior to starting the CCM services, as required by law.

187.  Frequently, neither Health Wealth Safe nor the Physician Practice Defendants established, implemented, revised, or regularly monitored the patients' Comprehensive Care Plans as required by law.

188.  Defendants also failed to provide the intensive services demanded by law.  For example, Defendants were not available 24-hours-a-day, 7-days-a-week to address the patients' acute chronic care needs, they did not conduct systematic assessments, they did not provide transitional care between healthcare settings, and they did not coordinate with the patients' other providers.

189.  Instead, for the most part, Defendants enrolled the patients into the program and Health Wealth Safe's navigators would call them monthly to ask generic questions.  This does not constitute the provision of CCM services as required by law.

190.  The CCM services billed by Medical Office Force on behalf of the Physician Practice Defendants were for services that were either not rendered or were worthless.  These are false claims.

### G. HIPAA Violations

191. To effectuate their illegal scheme, Defendants routinely violated the patients' HIPAA rights.

192. For example, the Physician Practice Defendants and Health Wealth Safe failed to obtain the patients' authorization when the Physician Practice Defendants provided Health Wealth Safe access to their EMR systems in order to market the myRemoteCheckup application.

193. The Defendants also failed to state the remuneration involved.

194. Further, Health Wealth Safe employees accessed the Physician Practice Defendants' HIPAA-protected data from their home computers, oftentimes not using VPN or some other encrypted log-in.

195. Even worse, at times, Health Wealth Safe's employees would share this protected health information on Google drives, Google documents, or other unsecured formats.

196. Relators also had concerns about the way in which Medical Office Force employees in India handled this protected health information.

197. Defendants' violation of HIPAA resulted in the submission of false claims.

### H. PPP Loan Fraud

198. Health Wealth Safe and Medical Office Force's fraud was not limited to this fraudulent RPM and CCM services scheme.

199. On April 12, 2020, Medical Office Force received a $134,486 PPP loan.

200. The government forgave this loan in its entirely on December 8, 2020.

201. In the loan information, Medical Office Force claims the loan amount was spent on payroll related to 63 Medical Office Force employees.

202. Relators are not aware of Medical Office Force having 63 employees.

203. In fact, Relators have only identified two Medical Office Force employees, Santosh Patel and Michelle Drayton.

204. In March 2020, Dawn Dobbs and others in senior management approached all of the Health Wealth Safe employees and announced that rather than serving as 1099 independent contractors as they had done throughout their employment, they would now be considered W-2 employees.

205. Publicly-available records show that Health Wealth Safe did not receive a PPP loan.

206. Based upon this information, Relators believe the purported employment conversion to W-2 employees (of what Relators thought was Health Wealth Safe) was part of Medical Office Force's PPP fraud.

207. Relators believe Defendant Medical Office Force submitted false certifications to the government related to this PPP loan.

## G. *Defendants Knew Their Conduct was Illegal*

208. The senior management of Health Wealth Safe and Medical Office Force are experienced healthcare professionals with years of experience operating in the highly regulated healthcare industry.

209. Despite this experience, neither Health Wealth Safe nor Medical Office Force provided its employees and contractors with training on the Anti-Kickback Statute, the False Claims Act, or the Medicare or Medicaid regulations related to RPM and CCM services.

210. However, as alleged above, on multiple occasions, Relators, other employees, and outside physicians alerted Defendants' management about the fraud.

211. Defendants knew their conduct was illegal, deliberately ignored the truth of their fraud, or at a minimum, recklessly disregarded the illegality of their conduct.

212. The Physician Practice Defendants knew their patients did not receive any RPM devices until April 2021.

## COUNT ONE
## SCHEME TO SUBMIT FRAUDULENT CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

213. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

214. Defendants submitted, or caused to be submitted, claims for RPM and CCM services that were either not actually performed, medically unnecessary, and/or worthless. The claims were also tainted by violations of the Anti-Kickback Statute and HIPAA. Defendants also submitted fraudulent claims related to its PPP loan.

215. Compliance with the Anti-Kickback Statute, Medicare and Medicaid regulations and policies governing RPM and CCM services, HIPAA, and the PPP requirements are material conditions of receiving reimbursement from federal healthcare programs and the federal government.

216. By virtue of the acts alleged herein, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

217. By virtue of the acts alleged herein, ill-gotten gains from the aforementioned presentation of false or fraudulent claims for payment or approval have been distributed to or enjoyed by Defendants.

218. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT TWO
## FALSE RECORDS FOR PAYMENT
## (31 U.S.C. § 3729(a)(1)(B))

219. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

220. By virtue of the acts alleged herein, Defendants made or used, or caused to be made or used, false records or statements representing that Defendants were compliant with the Anti-Kickback Statute, Medicare and Medicaid regulations, HIPAA, and the PPP requirements. All such false records or statements were knowingly made and material to the false or fraudulent claims paid or approved by the Government.

221. Defendants thus knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

222. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the

United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT THREE
## CONSPIRACY
### (31 U.S.C. § 3729(a)(1)(C))

223. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

224. Defendants knowingly conspired with each other and/or their employees and agents to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B) and to defraud the United States by causing federal health care programs to pay for false claims relating to services arranged through the payment of illegal kickbacks, obtained as a result of violating HIPAA, and provided in violation of the Medicare and Medicaid regulations regarding RPM and CCM services and by causing the government to pay for a fraudulent PPP loan.

225. By reason of Defendants' conspiracy, the United States has sustained damages in an amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim caused to be submitted.

## COUNT FOUR
## FAILURE TO RETURN OVERPAYMENTS
## (31 U.S.C. § 3729(a)(1)(G))

226. By knowingly engaging in the scheme set forth above and by violating the Medicare and Medicaid regulations governing RPM and CCM services, the Anti-Kickback Statute, and HIPAA, Defendants knew they were ineligible to participate in the Medicare and Medicaid services or to receive Medicare or Medicaid reimbursement for these services.

227. Defendants had a duty under federal law to return excess payments, known as overpayments, to Medicare withing 60 days of when the overpayments were identified. See 42 U.S.C. § 1320a-7k(d)(2).

228. Medicare payments that Defendants received after knowingly initiating the schemes set forth above were overpayments that Defendants had an affirmative legal obligation to report and return to CMS. Defendants are not entitled to keep federal taxpayer money they were not eligible to receive.

229. An overpayment knowingly retained after 60 days becomes and "obligation" withing the meaning of the reverse false claims provision of the False Claims Act, 42 U.S.C. § 1320a-7k(d)(3).

230. A defendant that "knowingly conceals or knowingly and improperly avoid or decreases an obligation" to return funds to federal programs is liable under the False Claims Act. 31 U.S.C. § 3729(a)(1)(G).

231. Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

232. Defendants improperly retained such overpayments with actual knowledge of the legal obligation to return the funds to the government, or with reckless disregard or deliberate ignorance of the legal obligation to return to the funds because they were not entitled to keep the funds.

233. By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claims.

## COUNT FIVE
## GEORGIA FALSE MEDICAID CLAIMS ACT
### (O.C.G.A. §§ 49-4-168, *et seq.*)

234. All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

235. By virtue of the acts alleged herein, Defendants submitted, or caused to be submitted, claims for RPM and CCM services that were either the result of kickbacks or HIPAA violations or were not actually rendered, medically unnecessary, and/or worthless.

236. By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims.

237. By virtue of the acts alleged herein, Defendants knowingly conspired with each other and/or their employees and agents to violate O.C.G.A. §§ 49-4-168 and to defraud the State of Georgia by causing Georgia Medicaid to pay for false claims relating to services arranged through the payment of illegal kickbacks, violations of HIPAA, or were either not actually performed, medically unnecessary, and/or worthless.

238. The Georgia Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay Medicaid claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

239. By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Pursuant to O.C.G.A. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus civil penalties for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, on each of these claims, Relators pray for judgment against Defendants:

(a) Awarding the United States treble damages sustained by it for each of the false claims and statements;

(b) Awarding the United States a maximum civil penalty for each of the false claims and statements;

(c) Awarding the State of Georgia treble damages sustained by it for each of the false claims and statements;

(d) Awarding the State of Georgia civil penalties for each of the false claims and statements;

(e) Awarding Relators the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and O.C.G.A. § 49-4-168.2

of the Georgia False Medicaid Claims Act and of the proceeds of this action or any alternate remedy or the settlement of any such claim;

(f)     Awarding Relators all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d), O.C.G.A. § 49-4-168.2, and any other applicable provision of the law;

(g)     Awarding Relators pre- and post-judgment interest on the awards ordered herein; and

(h)     Granting such other and further relief as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby demand a trial by jury as to all issues so triable.

Respectfully submitted this 27th day of June, 2022.

By: */s/ Elizabeth S. White*
    ELIZABETH S. WHITE
    Georgia Bar No. 258844
    lizwhite@pmkm.com
    CHARLES W. BYRD
    Georgia Bar No. 100850
    chuckbyrd@pmkm.com

    POPE, MCGLAMRY, KILPATRICK,
    MORRISON & NORWOOD, P.C.
    3391 Peachtree Road, NE, Suite 300
    P.O. Box 19337 (31126-1337)
    Atlanta, GA 30326
    (404) 523-7706

By: */s/ Adeash Lakraj*
    ADEASH AJ LAKRAJ
    Georgia Bar No. 444848
    alakraj@theleachfirm.com

    **THE LEACH FIRM**
    631 S. Orlando Ave., Suite 300
    Winter Park, FL 32789
    (770) 728-8478

By: */s/ Joshua M. Russ*
    JOSHUA M. RUSS *(Pro Hac Vice to be filed)*
    *Texas Bar* No. 24074990
    josh.russ@rm-firm.com
    ANDREW O. WIRMANI *(Pro Hac Vice to be filed)*
    Texas Bar No. 24052287
    andrew.wirmani@rm-firm.com
    ALLISON N. COOK *(Pro Hac Vice to be filed)*
    Texas Bar No. 24091695
    allison.cook@rm-firm.com

    **REESE MARKETOS LLP**
    750 N. Saint Paul St., Ste. 600
    Dallas, Texas 75201-3201
    (214) 382-9810

By: */s/ Arnold A. Spencer*
    ARNOLD A. SPENCER *(Pro Hac Vice to be filed)*
    Texas State Bar #00791709
    amoldspencer75225@gmail.com

    **SPENCER & ASSOCIATES**
    5956 Sherry Lane,
    Suite 2000
    Dallas, Texas 75225
    214-385-8500

*Attorneys for Plaintiff-Relator*

## **CERTIFICATION**

Pursuant to N.D. Ga. L.R. 7.1(D), counsel for Plaintiff hereby certifies that this document has been prepared with Times New Roman (14 point) font, which font has been approved under L.R. 5.1(C).